IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
IN ADMIRALTY

No. 7:14-CV-00077-F

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| Bald Head Island Transportation, Inc. ("Owner"), | ) |
| Bald Head Island Limited LLC ("Manager") | )  O R D E R |
| and M/V ADVENTURE, Official No. 916323, | ) |
| together with her Engines, Tackle and Apparel | ) |
| | ) |

This matter is before the court on the following motions: Claimant Tammy Strickland's

Motion for Summary Judgment [DE-65]; Plaintiffs' Motion to Dismiss Claimant Bonnie

Cockrell's Claim for Punitive Damages [DE-69]; Plaintiffs' Motion for Partial Summary

Judgment on Claimants' Punitive Damages Claims [DE-71]; Claimants Bonnie Cockrell, Mary

Beth Springmeier, and Steven Donecker's Motion for Summary Judgment [DE-72]; and

Claimants Tammy Strickland, Bonnie Cockrell, Steven Donecker and Mary Beth Springmeier's

Motion to Strike [DE-82]. The motions have been fully briefed and are ripe for disposition. For

the reasons stated below, Claimants Tammy Strickland, Bonnie Cockrell, Steven Donecker and

Mary Beth Springmeier's Motion to Strike is ALLOWED; Claimant Tammy Strickland's Motion

for Summary Judgment is ALLOWED; Plaintiffs' Motion to Dismiss Claimant Bonnie

Cockrell's Claim for Punitive Damages is DISMISSED without prejudice; Plaintiffs' Motion for

Partial Summary Judgment on Claimants' Punitive Damages Claims is DISMISSED without

prejudice; and Claimants Bonnie Cockrell, Mary Beth Springmeier, and Steven Donecker's

Motion for Summary Judgment is ALLOWED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The basic facts in this case are largely undisputed. Plaintiff Bald Head Island Transportation, Inc. ("BHIT") is a North Carolina corporation that was the Owner of the M/V ADVENTURE (the "Vessel"). Compl. [DE-1] ¶ 2. Plaintiff Bald Head Island Limited LLC ("BHIL") is a Texas limited liability company that was the Manager and *owner pro hac vice* of the Vessel. *Id.* ¶ 4.

There is no means to access Bald Head Island, North Carolina by land. Charles A. Paul Deposition [DE-68-7] at 59; Claude McKernan Deposition [DE-68-3] at 5. The Vessel is one of passenger ferries that Plaintiffs used to transport passengers between Southport, North Carolina and Bald Head Island, North Carolina. Charles A. Paul Deposition [DE-68-7] at 59.

On December 17, 2013, Captain Rodney Melton was in command during the 9:00 a.m. ferry run, and there were fifty-three passengers aboard the Vessel. Claude McKernan Deposition [DE-68-3] at 30. The Vessel was headed from Deep Point Marina in Southport to the Village of Bald Head Island. Compl. [DE-1] ¶ 5. At a speed of between 17-19 knots, the Vessel proceeded down the channel. ESI Expert Report [DE-71-15] at 3. Captain Melton piloted the Vessel past red buoy "18" on the starboard side. *Id.* After passing Buoy "18," Captain Melton initiated a port turn around the western end of Battery Island. *Id.* Captain Melton steadied on a course of about 140 degrees about the time that the Vessel passed red Buoy "16" to starboard. *Id.* The Vessel went 520 yards over about a minute before it experienced rapid deceleration because it had run aground at position 33.9025 North and 78.01315 West. *Id.* at 3-4. The Vessel ran aground on a sandbar in the Cape Fear River just southeast of marker 16 and Battery Island.

2

Compl. [DE-1] ¶ 5. As a result of the grounding, everyone was thrown forward. ESI Expert Report [DE-71-15] at 4.

Certain passengers and a crew member aboard the Vessel have alleged injuries and damages. Compl. [DE–1] ¶ 8. The crew member is Bonnie Cockrell and the passengers are Steven Donecker, Tom Griffin, Bernie Loerzel, Victor Magana, Richard Scearce, David Simmons, Mary Beth Springmeier, Tammy Strickland and Robert Weisser. *Id.* Plaintiffs received their first notice of claim arising from the December 17, 2013 grounding on January 6, 2014. *Id.* ¶ 7.

On April 23, 2014, Plaintiffs filed this action for exoneration from or limitation of liability pursuant to the Limitation of Liability Act, 46 U.S.C. § 30501, *et seq.*, Fed. R. Civ. P. 9(h) and Rule F of the Supplemental Rules for Admiralty or Maritime Claims. Plaintiffs contend that they are entitled to exoneration from or limitation of liability because the injuries sustained by known and unknown claimants were sustained without privity or knowledge by either Plaintiff. *Id.* ¶¶ 5, 9.

On May 1, 2014, the Clerk of Court entered a Notice [DE-11] advising that Plaintiffs had filed a Complaint for exoneration from or limitation of liability of all claims arising out of the December 17, 2013 voyage. The Notice provided that all persons with a claim must file it on or before June 15, 2014, or be defaulted. [DE-11] at 2. The following individuals filed an Answer and Claim: Steven A. Donecker, Mary Beth Springmeier, Richard W. Scearce, III, Tammy Strickland, and Bonnie Cockrell. Old Baldy Foundation, Inc. and Employers Assurance filed a Notice and Claim of Subrogation Lien [DE-30] regarding claimant Mary Beth Springmeier. On August 5, 2014, this court entered an Entry of Default Against Non-Appearing Parties [DE-48].

3

Plaintiffs and Richard W. Scearce, III entered into a settlement agreement [DE-59-1], which was approved by this court. On December 4, 2014, Scearce was dismissed as a claimant in this action, and all his claims were dismissed with prejudice. [DE-62] at 2.

## II. STANDARDS OF REVIEW

### A. Summary Judgment

The standard for granting summary judgment is well established. "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the burden bears the initial burden of informing the court of the basis for its motion and identifying the matter it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the court determines whether summary judgment is appropriate, it must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, v. *Zenith Radio Corp.*, 475 U.S. 574, 587-88 (citing *United States v. Diebold, Inc.* 369 U.S. 654, 655 (1962)).

### B. Rule 12(b)(6) Motion to Dismiss

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint, not to resolve conflicts of fact or to decide the merits of the action. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999). In considering a motion to dismiss, the

4

court assumes the truth of all facts alleged in the complaint and the existence of any fact that can be proved which is consistent with the complaint's allegations. *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'shp*, 213 F.3d 175, 180 (4th Cir. 2000). However, the "'[f]actual allegations must be enough to raise a right to relief above the speculative level'" and the plaintiff must allege "'enough facts to state a claim to relief that is plausible on its face.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 n.26 (4th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, a court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts.*, 213 F.3d at 180.

## III. DISCUSSION

### A. The Limitation of Liability Act

Under the Limitation of Liability Act, "the liability of the owner of a vessel for any claim, debt, or liability . . . shall not exceed the value of the vessel and pending freight," 46 U.S.C. § 30505(a), provided that such claims, debts, or liabilities "aris[e] from any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without privity or knowledge of the owner," except as otherwise excluded by law, *id.* § 30505(b).

5

In order to avail itself of the protection of the statute, "[t]he owner of a vessel may bring a civil action in a district court of the United States for limitation of liability . . . within 6 months after a claimant gives the owner written notice of a claim." 46 U.S.C. § 30511(a). For purposes of the limitation of liabilities, "the term 'owner' includes a charterer that mans, supplies, and navigates a vessel at the charterer's own expense or by the charterer's own procurement. 46 U.S.C. § 30501. After the owner posts the security required by 46 U.S.C. § 30511(b), the court then "issue[s] a notice to all persons asserting claims with respect to which the [petition] seeks limitation." Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Fed. R. Civ. P., Supp. R. F(4).

In a limitation proceeding, the district court, sitting in admiralty without a jury, engages in a two-step inquiry. *In re Complaint of Dammers & Vanderheide & Scheepvaart Maats Christina B.V.*, 836 F.2d 750, 755 (2d Cir. 1988). Under the first step, the court must determine which act of negligence or conditions of unseaworthiness caused the accident. *Verrett v. McDonough Marine Service*, 705 F.2d 1437, 1444 (5th Cir. 1983). "[T]he court must determine whether the accident was caused by conduct that is actionable, for '[i]f there was no fault or negligence for the shipowner to be "privy" to or have "knowledge" of within the meaning of the statute, there is no liability to be limited,' and the owner would then be entitled to exoneration." *In re Complaint of Messina*, 574 F.3d 119, 126 (2d Cir. 2009) (quoting *The 84-H*, 296 F. 427, 432 (2d Cir. 1923)). Second, if the court finds that acts of negligence or unseaworthiness caused the casualty, the court must determine whether the shipowner had knowledge or privity of the acts of negligence or conditions of unseaworthiness. *Id.* "When a corporation owns the vessel, the test is whether culpable participation or neglect of duty can be attributed to an officer, managing

6

agent, supervisor, or other high-level employee of the corporation." *Carr v. PMS Fishing Corp.*,

191 F.3d 1, 4 (1st Cir. 1999). The claimants bear the initial burden of establishing liability,

following which the vessel owner bears the burden of establishing the lack of privity or

knowledge. *Otal Investments Ltd. v. M/V CLARY*, 673 F.3d 108, 115 (2d Cir. 2012); *Beiswenger*

*Enterprises Corp. v. Carletta*, 86 F.3d 1032, 1036 (11th Cir. 1996).

## B. Claimants Tammy Strickland, Bonnie Cockrell, Steven Donecker and Mary Beth Springmeier's Motion to Strike[1]

Claimants Tammy Strickland, Bonnie Cockrell, Steven Donecker and Mary Beth

Springmeier have moved to strike Plaintiffs' supplemental interrogatory responses pursuant to

Rule 16(f) of the Federal Rules of Civil Procedure and the Discovery Scheduling Order, as

entered on August 21, 2014 [DE-51], and modified on September 25, 2014 [DE-54]. Mot. to

Strike [DE-82] at 1. Claimants Strickland, Cockrell, Donecker and Springmeier have also

moved to strike the supplemental interrogatory responses pursuant to Rule 26 of the Federal

Rules of Civil Procedure, on the basis that the responses are untimely. *Id.*

### 1. Background

On August 21, 2014, U.S. Magistrate Judge Robert B. Jones, Jr. entered a Scheduling

Order [DE-51] governing Phase I of the litigation.[2] The claimants served their interrogatories on

Plaintiffs on September 9, 2014. Mem. of Law in Supp. of Mot. to Strike [DE-83] at 1-2. On

---

[1]The Motion to Strike was filed by Claimant Tammy Strickland, but Claimants Bonnie Cockrell, Steven Donecker and Mary Beth Springmeier join Claimant Strickland in her motion. [DE-82] at 1.

[2]The Scheduling Order notes that this action will be bifurcated into two phases. [DE-51] at 1. The primary focus of Phase I will be issues related to exoneration and limitation of liability under Rule F of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. *Id.* The focus of Phase II will be any remaining claimant's respective damages. *Id.*

7

September 25, 2014, Judge Jones entered an Amendment To Scheduling Order [DE-54] in response to the parties' joint motion to amend the scheduling order. The Amendment To Scheduling Order amended the following deadlines: The date reports from retained experts were due was changed to December 12, 2014, for the party with the burden of proof and January 12, 2015, for the opposing/responsive experts; the close of discovery was set for February 11, 2015; the deadline for filing Rule 26(a)(3) disclosures was set for February 26, 2015; the deadline for objections to Rule 26(a)(3) disclosures was set for March 13, 2015; and the deadline for filing all potentially dispositive motions was set for March 30, 2015. [DE-54] at 1. The remainder of the Scheduling Order remained unmodified. *Id.* The Scheduling Order provides in pertinent part that "[s]upplementation under Rule 26(e) must be made promptly after receipt of the information by the party or counsel, but in no event later than the close of discovery." [DE-51] at 2.

On November 10, 2014, Plaintiffs served their responses to the claimants' first set of interrogatories, and Charles A. Paul, III verified Plaintiffs' responses. Mem. of Law in Supp. of Mot. to Strike [DE-83] at 2, [DE-83-1] at 21. The relevant interrogatories are 4, 7 and 11. The interrogatories and responses are as follows:

> 4) Describe fully and completely how you claim the Incident occurred, its cause, any errors or omission contributing thereto and by whom committed, Identifying all Persons with knowledge thereof and all Documents, ESI and the Electronic media related thereto.
>
> **ANSWER**: Limitation Plaintiffs state that the grounding occurred because Captain Eugene Melton lost track of his position, began the port turn too soon, and held the port turn too long causing the Vessel to encounter water shallower than the Vessel's draft. . . .
>
> 7) Identify every fact that You claim supports the allegations contained in Paragraph 9(c) of your Complaint (i.e., that "*None of the injuries and damages alleged by any of the Claimants was caused by any fault or neglect of the Plaintiffs, jointly or*

8

*severally*."), Identifying all Persons with knowledge thereof and all Documents, ESI and the Electronic media related thereto.

**ANSWER**: See Limitation Plaintiffs' responses to Interrogatories 5 and 6 herein.

Investigation into this matter is ongoing and this response will be supplemented if necessary in accordance with the Federal Rules of Civil Procedure.

11) On the Incident Date, did You have a (formal or informal) safety management system (e.g. ISM, etc) in effect that applied to the Vessel? If so, Identify all Documents, ESI and the Electronic media in effect on the Incident Date which were part of Your Vessel's safety management system, including without limitation, those which related to keeping or stationing a proper lookout, watch standing, vessel electronic use, collision avoidance, grounding avoidance, manning requirements, navigating in the proximity of other vessels, crew endurance management, crew relief and voyage planning. This includes but is not limited to Your safety management manual, vessel instructions for key shipboard operations pertaining keeping or stationing a proper lookout, watch standing, vessel electronic use, collision avoidance, grounding avoidance, depth monitoring, radar use and observation, manning requirements, navigating in the proximity of other vessels, crew endurance management, crew relief and voyage planning, and safety management system internal audits which verify safety activities on the voyage planning, and safety management system internal audits which verify safety activities on the Vessel, from 1 January 2009, through the present. Include in Your response an Identification of all Persons with knowledge thereof and Documents, ESI and the Electronic Media related thereto.

**ANSWER**: Yes Limitation Plaintiffs had a safety management system in effect that applied to the vessel. . . .

In addition to the information contained in the aforementioned responses and documents, regarding general safety for Limitation Plaintiffs, BHIL hired Richard Scearce as Safety Officer in 2005. Mr. Scearce provided a number of safety training sessions for BHIL employees including CPR, First aid, AED, blood borne pathogen training, accident reporting, ride with the Driver, MSDA training, lock out tag out, ANSL Fire Suppression Training and certification, Fire extinguisher training, training, and other sessions which applied to the Vessel. BHIT also provided safety stand down meetings from time to time and held Employee safety recognition cook-outs to reward safe behavior.

Claude McKernan, Shirley Mayfield, and Richard Scearce, along with all captains, crewmembers, and other employees have knowledge regarding the safety management system.

Investigation into this matter is ongoing and this response will be supplemented if necessary in accordance with the Federal Rules of Civil Procedure.

9

Mem. of Law in Supp. of Mot. to Strike [DE-83-1] at 4, 6, 8-9.

Charles A. Paul, III, President of BHIT and CEO and Manager of BHIL, was deposed on December 31, 2014. Charles Paul Deposition [DE-68-7] at 5. At that time, Paul acknowledged that Plaintiffs' responses to the claimants' first set of interrogatories were true when made and remained true to the best of his knowledge. *Id.* at 24.

On December 15, 2014, Plaintiffs produced a corrected expert report from Engineering Systems Inc. *See* ESI Expert Report [DE-68-11]. The report concluded as follows:

> The cause of the grounding incident is directly related to the manner in which the vessel was operated on the subject run. The primary factors are related to the operator error in the form of inattention combined with possible limitations on visibility due to the sun position and route of travel of the vessel being aligned.

*Id.* at 12.

On January 19, 2015, Plaintiffs disclosed the report from their rebuttal expert, Captain Donald W. Davis. *See* Captain Davis' rebuttal expert report [DE-83-3]. In his report, Captain Davis opined "[t]hat the sole and proximate cause of the grounding of the M/V "ADVENTURE" (Official No. 916323), that occurred at the south end of Battery Island, Cape Fear River, on the morning of December 17, 2013, was the result of temporary loss of situational awareness by the master, Capt. Eugene Rodney Melton." *Id.* at 9.

Plaintiffs amended their responses to the claimants' interrogatories on March 24, 2015. *See* Pls' 1st Amended Answers to Claimants' Interr. [DE-83-4]. Plaintiffs amended their response to Interrogatory #4 to read as follows:

> Limitation Plaintiffs state that the grounding was solely caused by a spontaneous navigational error made by Captain Eugene Melton when he began a port turn too soon, and held the port turn too long causing the Vessel to encounter water shallower than the Vessel's draft. Claimants are directed to Limitation Plaintiffs' Initial

10

Disclosures for information regarding people who may have knowledge regarding the grounding after it occurred. Claimants are further directed to the USCG AIS Data regarding the track and position of the vessel on the day of the grounding.

*Id.* at 3. Interrogatory #7 was amended to read that "Limitation Plaintiffs state that the sole cause of the grounding was Captain Melton's spontaneous and unique navigational error constituting simple, ordinary negligence without any prior warning. Such negligence occurred in the scope of Captain Melton's employment with Bald Head Island Limited." *Id.* at 5. Interrogatory #11 was also amended to include the following: "Scearce had no responsibilities with respect to the selection, monitoring, assignment or performance of any captains or crew members for the ferries, nor did he provide any assistance with respect to the maintenance of the ferries, the navigation of any vessel or the operational safety of those voyages." *Id.* at 8.

On March 30, 2015, Plaintiff's filed their Motion for Partial Summary Judgment on Claimants' Punitive Damages Claims [DE-71]. Plaintiffs filed their First Amended Answers to Claimants' Interrogatories in support of their motion. *See* Pls' Mt. for Part. Summ. Judg. [DE-71-27].

**2. Discussion**

Plaintiffs initially argue that the claimants' Motion to Strike should not be considered by this court because it fails to comport with Rule 7.1(c) of the Local Civil Rules. Pls' Response to Mt. to Strike [DE-86] at 2-3. Specifically, Plaintiffs contend that the claimants failed to certify that there had been a good faith effort to resolve the discovery dispute before the filing of their Motion to Strike. *Id.*

The United States District Court for the Eastern District of North Carolina's Local Civil Rule 7.1 provides as follows:

11

**(c) Motions Relating to Discovery and Inspection**.

> No motions to compel discovery or other motions relating to discovery or inspection will be considered by the court unless the motion sets forth or has attached thereto, by item, the specific question, interrogatory, etc., with respect to which the motion is filed, and any objection made along with the grounds supporting or in opposition to the objection. Counsel must also certify that there has been a good faith effort to resolve discovery disputes prior to the filing of any discovery motions.

Local Civil Rule 7.1(c).

In this case, the court concludes that the claimants did not need to comply with Local Civil Rule 7.1(c) because the Motion to Strike Plaintiffs' supplemental interrogatory responses is not a motion to compel discovery or other motion relating to discovery or inspection. *See Mezu v. Morgan State University*, 269 F.R.D. 565, 579 n.11 (D.Md. 2010) (noting that "discovery" refers to the methods of producing information that is within the scope of discovery set forth in Federal Rule of Civil Procedure 26(b)(1), which includes interrogatories (Rule 33), document production requests (Rule 34), depositions (Rules 30-32), motions for physical and mental examinations (Rule 35), and requests for admission of facts and genuineness of documents (Rule 36)). Accordingly, the court will proceed to address the merits of the claimants' Motion to Strike.

As noted, the claimants have moved to strike Plaintiffs' supplemental interrogatory responses pursuant to Federal Rule of Civil Procedure 16(f) and the court's Discovery Scheduling Order. Federal Rule of Civil Procedure 16 governs pretrial conferences, scheduling, and general case management. Subsection (f) of that rule addresses sanctions and provides as follows:

> (1) *In General.* On motion or on its own, the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney:

12

(A) fails to appear at a scheduling or other pretrial conference;
(B) is substantially unprepared to participate–or does not participate in good
faith–in the conference; or ·
(C) fails to obey a scheduling or other pretrial order.

Fed. R. Civ. P. 16(f). Rule 16(f) refers to sanctions authorized by Rule 37(b)(2)(A) when a party

fails to comply with a discovery order. Those sanctions include:

(ii) prohibiting the disobedient party from supporting or opposing designated claims
or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to
submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A).

A Rule 16(f) analysis is focused on whether there is good cause for the failure to timely

disclose. *SMD Software, Inc. v. EMove, Inc.* No. 5:08-CV-403-FL, 2013 WL 5592808, at \*4

(E.D.N.C. Oct. 10, 2013); *Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 309 (M.D.N.C. 2002).

When the court determines that the violation was without good cause, it has broad discretion to

employ sanctions. *SMD Software, Inc.*, 2013 WL 5592808, at \*4; *Akeva L.L.C.*, 212 F.R.D. at

311. When determining what sanctions are appropriate, the court may consider the following

factors:

(1) the explanation for the failure to obey the order; (2) the importance of the
testimony; (3) the prejudice to the opposing party by allowing the disclosures; (4)
the availability of alternative or lesser sanctions; (5) the interest in expeditious

13

resolution of litigation; (6) a court's need to manage its docket; and (7) public policy favoring disposition of cases on the merits.

*SMD Software, Inc.*, 2013 WL 5592808, at \*4.[3]

Under the first factor, the court must look at the explanation for failure to obey the order. In this case, there has been no explanation provided by Plaintiffs for altering their interrogatory responses. Plaintiffs did not move to amend the court's Scheduling Order or Amendment To Scheduling Order. Moreover, Plaintiffs did not inquire whether the claimants would consent to supplementation.

As to the second factor, the court must look to the importance of the matter. Here, the amended interrogatory responses go to the very heart of the case by addressing privity and knowledge of a condition which likely caused the grounding. Plaintiffs' amended interrogatory responses seek to represent that a quick steering error or error in judgment caused the accident. Plaintiffs also seek to restrict the duties and knowledge of Richard Scearce, their Safety Officer.

Under the third factor, the court must look at prejudice to the claimants if Plaintiffs are allowed to amend their interrogatory responses. The claimants argue that allowing the supplemental disclosure after the expiration of the discovery deadline would severely prejudice all claimants because they followed a logical progression with their discovery by serving written

---

[3]As the claimants note, there is legal authority within the Fourth Circuit that the five factors for determining whether evidence should be excluded under Rule 37(c)(1), as set forth in *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003), should also be used in a Rule 16(f) analysis. *See East West LLC v. Rahman*, No. 1:11-CV-1380, 2012 WL 4105129, at \*6 (E.D.Va. Sept. 17, 2012). The Rule 37 factors include "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

14

discovery and then taking depositions based upon the responses to the written discovery requests. Mem. of Law in Supp. of Mot. to Strike [DE-83] at 8. Also, the claimants point out that they did not depose Plaintiffs' experts because Plaintiffs' experts supported the claimants' theory and Tammy Strickland's Motion for Summary Judgment. *Id.*

The fourth factor requires the court to look at the availability of alternative or lesser sanctions. Here, the claimants note that more onerous sanctions include dismissal of the case or summary judgment against Plaintiffs. *Id.* The claimants argue that nothing less than striking Plaintiffs' attempt to change the case at the eleventh hour will suffice in this case because anything less would essentially require restarting discovery by re-taking most of the twenty-two depositions taken by the claimants and re-analyzing the case from the new perspective offered by the amended interrogatory responses.[4] *Id.* at 8-9. The claimants further argue that they would have to discuss the changes with potential experts and pay some to analyze the case for "navigational error." *Id.* at 9. The claimants conclude that it would be too time-consuming and expensive to restart discovery. *Id.*

With the fifth factor, the court must address the interest in the expeditious resolution of the litigation. The claimants contend that striking the amended interrogatory responses is the most expeditious way to move this case along while preventing unfair prejudice to either side. Mem. of Law in Supp. of Mot. to Strike [DE-83] at 9.

_____

[4]According to the claimants, nearly all of the twenty-two depositions addressed Captain Melton's inattentiveness and related topics, as well as Scearce's roles and responsibilities. Mem. of Law in Supp. of Mot. to Strike [DE-83] at 8.

15

Under the sixth factor, the court should address the need to manage its docket. The claimants argue that striking the amended interrogatory responses is consistent with this court's need to manage its docket. *Id.*

In the seventh and final factor, the court must consider that public policy favors the disposition of cases on the merits. The claimants argue that allowing Plaintiffs to amend their interrogatory responses does not support disposition of the case on the merits and will merely serve to slow down the resolution of the action by possibly creating a "sham" issue of fact. *Id.*

In light of the foregoing factors, the court agrees with the claimants that allowing Plaintiffs to use their amended interrogatory responses would be extremely prejudicial and would require the claimants to restart the discovery process. As the claimants point out, this would be very time-consuming and expensive. The court believes that preventing Plaintiffs from benefitting from the use of their attempt to change the case at the eleventh hour is the only appropriate sanction. Accordingly, Claimants Tammy Strickland, Bonnie Cockrell, Steven Donecker and Mary Beth Springmeier's Motion to Strike [DE-82] is ALLOWED. The court will not consider Plaintiffs' amended interrogatory responses when ruling on Tammy Strickland's Motion for Summary Judgment or Plaintiffs' Motion for Partial Summary Judgment. The court, however, declines to "strike" Plaintiffs' amended interrogatory responses because Federal Rule of Civil Procedure 12(f) only allows a court to strike pleadings. *See* Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."); *see also Int'l Longshoremen's Assn., Steamship Clerks Local 1624, AFL-CIO v. Virginia Int'l Terminals, Inc.*, 904 F. Supp. 500, 504 (E.D. Va. 1995)

16

(concluding that summary judgment briefs and affidavits are not pleadings and therefore a Rule 12(f) motion could not be used to "strike" such documents).

### C. Claimant Tammy Strickland's Motion for Summary Judgment and Claimants Bonnie Cockrell, Mary Beth Springmeier, and Steven Donecker's Motion for Summary Judgment

Claimant Tammy Strickland moves for this court to grant her motion for summary judgment and dismiss Plaintiffs' complaint for exoneration from and limitation of liability with prejudice, arguing that the parties agree that the December 17, 2013 grounding of the vessel was the result of negligence, Plaintiffs had knowledge that Captain Melton was chronically inattentive prior to the grounding and Richard Scearce's verified testimony establishes sufficient corporate knowledge to grand summary judgment. Strickland's Mem. of Law in Supp. of Mt. for Summ. Jud. [DE-66] at 7-9.

Claimants Bonnie Cockrell, Mary Beth Springmeier, and Steven Donecker have moved for this court to grant their motion for summary judgment and dismiss the Limitation Action, arguing that Plaintiffs cannot disprove that their negligent acts, policies and unseaworthy vessel may have contributed to the December 17, 2013 grounding. Mem. in Supp. of Mt. for Summ. Jud. [DE-73] at 20. Specifically, the claimants argue that with Plaintiffs' permission and urging, the Vessel was purposefully operated outside of a marked navigation channel and grounded on a charted obstruction. *Id.* at 20-22. Further, the claimants argue that Plaintiffs were negligent in employing a chronically inattentive captain who had a documented history of failing to maintain situational awareness, not keeping his eyes on the road and not keeping a proper lookout. *Id.* at 23-24. The claimants also contend that Plaintiffs were negligent for not providing a dedicated lookout for the Vessel when they knew she would be operated outside of the marked channel in

17

close proximity to known shoals, at high speed, and with the grounding alarm off. *Id.* at 24-25. The claimants further contend that Plaintiffs were negligent and the Vessel was unseaworthy by employing a ferry master with no training in grounding avoidance who was not qualified to operate the Vessel's radar and for allowing the Vessel to operate with its grounding avoidance equipment either turned off, malfunctioning or out of date. *Id.* at 25-29. Finally, the claimants argue that Plaintiffs' Safety Officer, Richard Scearce, has sworn to Plaintiffs' negligence and to its privity and knowledge of the Vessel's negligence. *Id.* at 29-30.

### 1. The December 17, 2013 grounding was the result of Plaintiffs' negligence.

The elements of a negligence claim in a limitation of liability proceeding under maritime law are the same as the elements of negligence under common law. *In re RE*, No. 07-CV-223, 2008 WL 4069747, at *3 (E.D.N.Y. Aug. 27, 2008). These elements are duty, breach of duty, causation, and damages. *In re Bridge Const. Services of Florida, Inc.*, 39 F. Supp. 3d 373, 382 (S.D.N.Y. Aug. 11, 2014) (citing *Cornfield v. Cornfield*, 156 Fed. Appx. 343, 344 (2d Cir. 2005)).

In this case, the parties do not dispute that the December 17, 2013 grounding of the Vessel was the result of negligence. Plaintiffs concede that exoneration is not appropriate because the grounding was caused by Captain Melton's "spontaneous negligent navigational error." Mem. in Oppos. to Strickland's Mt. for Summ. Jud. [DE-68] at 2, 8-9. Plaintiffs further concede that at the time of the grounding, Captain Melton was the captain of the Vessel and was an employee of Plaintiffs who was acting within the scope of his employment and on the business of Plaintiffs. *Id.* at 9. Plaintiffs admit that the grounding on a known stationary object, a sandbar in the vicinity of Battery Island, constitutes negligence which is imputable to Plaintiffs.

18

*Id.*; *see McAlister Towing of Va., Inc. v. U.S.*, No. 2:10CV595, 2012 WL 1438770, at \*9 (E.D.Va. April 25, 2012) (When a moving vessel strikes a stationary object, "knowledge of an otherwise nonvisible object warrants imposition of presumed negligence against those operating the vessel who possessed this knowledge.") (internal citation omitted); *Complaint of Nautilus Motor Tanker Co., Ltd.* 862 F. Supp. 1260, 1274 (D.N.J. 1994) (There is a presumption of negligence when a vessel strikes a charted obstruction.); *McAllister Bros., Inc. v. United States*, 709 F. Supp. 1237, 1251 (S.D.N.Y. 1989) ("Striking a charted obstruction such as a reef raises a presumption of negligence.").

## 2. There are no genuine issues of material fact on the issue of Plaintiffs' privity or knowledge and Plaintiffs have failed to carry their burden of demonstrating the lack of privity or knowledge.

Because negligence is undisputed at the first step of the limitation of liability proceeding, the court must determine whether the vessel owner who is not entitled to exoneration due to acts of fault might be still be entitled to a limitation of liability. *In re Moran Towing Corp.*, 984 F. Supp. 2d 150, 180 (S.D.N.Y. Nov. 18, 2013). The owner is entitled to limit its liability to the value of the vessel and her cargo if the negligence or unseaworthiness causing the injuries was outside the "privity or knowledge" of the owner. 46 U.S.C. § 30505(a), (b); *In re Lyon Shipyard, Inc.*, No. 2:14CV422, 2015 WL 1033807, at \*4 n.7 (E.D.Va. March 9, 2015).

The shipowner bears the burden of establishing lack of privity or knowledge. *Otal Investments Ltd.*, 673 F.3d at 115. In order for the shipowner to meet its burden, it "must show how the loss occurred, together with its lack of privity to or knowledge of the asserted cause. If it cannot show how the loss occurred, a defendant must exhaust all the possibilities, and show that as to each it was without the requisite privity or knowledge." *Terracciano v. McAlinden Const.*

19

*Co.*, 485 F.2d 304, 307-08 (2d Cir. 1973). A shipowner has privity if he personally participated in the negligent conduct or was responsible for bringing about the unseaworthy condition. *Trico Marine Assets Inc. v. Diamond B Marine Services Inc.*, 332 F.3d 779, 789 (5th Cir. 2003) (citing *Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1473 (5th Cir. 1991)). When a shipowner is a corporation, knowledge is judged by what the corporation's managing officers actually knew and by what they should have known with respect to conditions or actions likely to cause the loss. *Id.* at 789-90.

> ### a. Plaintiffs employed a chronically inattentive captain who had a documented history of failing to maintain situational awareness, not keeping his eyes on the road and not keeping a proper lookout.

"The master of a vessel is 'under a continuing duty to know where his vessel is at all times, and he, or those under him, are (or should be) in possession of all other pertinent facts relating to the voyage." *Complaint of Nautilus Motor Tanker Co., Ltd.*, 862 F. Supp. at 1274 (quoting *Mid-America Transp. Co., Inc. v. Nat'l Marine Serv., Inc.*, 497 F.2d 776, 780 (8th Cir. 1974)). The owner of a vessel has a duty to use "'due and proper care'" to provide a competent crew. *In re Complaint of Messina*, 574 F.3d 119, 127 (2d Cir. 2009) (quoting *Tug Ocean Prince*, 584 F.2d 1151, 1155 (2d Cir. 1978)). In order to satisfy the due and proper care standard, the owner must have an objectively reasonable basis for his belief in the competence of the person to whom he is entrusting the vessel. *Id.*

Captain Melton lost situational awareness and did not know where he was at the time of the December 17, 2013 grounding. Captain Melton's Interview (Exhibit 74) [DE-75-13] at 80; Charles Paul Deposition [DE-68-7] at 12; Claude McKernan Deposition, Vol. 2 [DE-71-16] at 14; Plaintiffs' Answers to Interrogatories (Exhibit 76) [DE-75-14] at 1-2. Plaintiffs' knowledge

20

of this problem is well documented in Captain Melton's personnel records leading up to the date of the grounding.

In Captain Melton's 2006 Performance Appraisal, prepared by Transportation Manager Claude McKernan, it states that Captain Melton "takes his 'eyes off the road' too often." Strickland's Mem. of Law in Supp. of Summ. Jud. [DE-66-3] at 3. McKernan testified that he had never put in another captain's review that he takes his eyes off the road too often and that with Captain Melton it was a "real concern." Claude McKernan Deposition [DE-68-3] at 52-53.

It was noted in Captain Melton's 2008 Performance Appraisal that a performance objective was for him to "[a]void the tendency to leave the helm or 'take [his] eyes off the road' for more than a few seconds." Strickland's Mem. of Law in Supp. of Summ. Jud. [DE-66-5] at 7. McKernan explained that keeping your "eyes on the road" is a euphemism that means to pay attention and stay involved on the waterway out ahead of you. Claude McKernan Deposition [DE-68-3] at 34. When asked about the objective to avoid the tendency to leave the helm and not take his eyes off the waterway for more than a few seconds, McKernan testified, "[Captain Melton] is who he is. He's got an imperfection." *Id.* at 54. McKernan further testified that he had never had to tell another captain not to leave the helm. *Id.*

Captain Melton's 2009 Performance Appraisal demonstrated that Captain Melton had "[q]uestionable judgment occasionally when allowing [himself] to be distracted from the task at hand." Strickland's Mem. of Law in Supp. of Summ. Jud. [DE-66-6] at 3. On January 7, 2010, Claude McKernan had a counseling session with Captain Melton. At that time, McKernan directed Captain Melton to "maintain situational awareness." Strickland's Mem. of Law in Supp. of Summ. Jud. [DE-66-7] at 1.

21

In his 2010 Performance Appraisal, Captain Melton was given the following performance objectives: "Pay closer attention to the helm when conning a vessel. Do not walk away from the helm leaving it unattended. Put a relief on the helm if you need to tend to other responsibilities." Strickland's Mem. of Law in Supp. of Summ. Jud. [DE-66-8] at 6.

On September 15, 2011, Captain Melton received an Employee Disciplinary Report, which noted that he failed to "maintain situational awareness." Strickland's Mem. of Law in Supp. of Summ. Jud. [DE-66-9] at 1. Captain Melton received the following instructions:

> Do not allow unauthorized persons into the wheelhouse. Pay attention to the things that you are being paid to pay attention to. Ensure the safety of your crew and passengers. Maintain awareness of the ferry operation, both on board and on the dock while you are moored. There should always be a valid reason for what you are doing while you are on watch as Ferry Master.

*Id.* at 3. Captain Melton was advised that this was a "final warning" and that further violations would lead to "[f]urther disciplinary action up to and possibly including termination." *Id.* In Captain Melton's 2012 Performance Appraisal, he was given the performance objective of keeping his "eyes on the road." Strickland's Mem. of Law in Supp. of Summ. Jud. [DE-66-10] at 4.

McKernan testified that Captain Melton had the traits of letting his eyes wander and a lack of focus. Claude McKernan Deposition [DE-68-3] at 70. McKernan also testified that he had known that Captain Melton would be "momentarily distracted," but McKernan suggested he did not believe it had risen to the level that there was a safety concern. *Id.* at 61.

Plaintiffs' employee Captain Elizabeth Blee discussed her knowledge of Captain Melton's chronic inattentiveness. Captain Blee testified that Captain Melton lost focus fairly often during his shifts. Elizabeth Sumner Blee Deposition [DE-78-7] at 6. According to Captain

Blee, Captain Melton was a smoker and frequently took smoke breaks from the wheelhouse. *Id.*

Also, Captain Melton was a reader and often read. *Id.* Captain Blee testified that Captain

Melton was an avid photographer and took "a lot" of pictures of birds and wildlife on his trips.

*Id.* Captain Blee also testified that Captain Melton loved the dogs on the boat and would feed

them dog biscuits. *Id.* Captain Blee testified that Captain Melton would step away from the

wheel to put something into the microwave. *Id.* at 8. Captain Blee explained that Captain

Melton engaged in all these activities while the vessel was underway and he was the only master

on board the vessel. Elizabeth Sumner Blee Deposition [DE-78-7] at 7.

Deckhand Ira Adelman noted that Captain Melton had a tendency to be complacent in his

operations at times. Ira Adelman Deposition [DE-78-6] at 3. Deckhand Adelman also noted that

there were times when Captain Melton was more interested in taking pictures with his camera or

going down for a smoke than paying attention to safely crossing the river. *Id.* at 4. Deckhand

Adelman explained that Captain Melton could be preoccupied at times with things other than

safe navigation. *Id.* at 6. Deckhand Adelman testified that he had many times seen Captain

Melton walk over to the microwave in the wheelhouse with nobody at the helm. *Id.*

According to Deckhand Adelman, Captain Melton also ate food that required the use of utensils

while he was conning the vessel. *Id.* at 8.

### b. At Plaintiffs' permission and urging, the Vessel was purposefully operated outside of a marked navigation channel and grounded on a charted hazard.

At the time of the December 17, 2013 grounding of the Vessel, Plaintiffs' written policy

materials regarding the Deep Point Ferry Route directed the ferry captains to "[r]emain between

the buoys as you head down the river." Exhibits in Support of Mt. for Summ. Jud. [DE-74-1] at

23

12; Claude McKernan Deposition [DE-68-3] at 14. The written policy materials also directed the captains to "[r]emain within the confines of the marked channel." Exhibits in Support of Mt. for Summ. Jud. [DE-74-1] at 12. Claude McKernan testified, however, that he issued "prior guidance" authorizing operation outside the channel if there was a "clear and compelling reason to do otherwise." Claude McKernan Deposition [DE-68-3] at 26. The "compelling reasons" included "fuel savings" and "making up time." *Id.* at 38.

Plaintiffs' policy allowing operation outside the marked channel was reduced to writing shortly after the December 17, 2013 grounding. *Id.* at 38-39; Exhibits in Support of Mt. for Summ. Jud. [DE-74-2] at 11-12. According to McKernan, the update to their Marine Operations manual more accurately depicted the actual policy in place on the day of the grounding, and the update was promulgated to "clear up any sort of confusion or misunderstanding." Claude McKernan Deposition [DE-68-3] at 38-39. Captain Melton confirmed that the update reflected the policy in place at the time of the grounding. Captain Melton Deposition [DE-68-4] at 17. On the day of the grounding, McKernan provided Captain Melton with the "Reduce Wake" memo, which stated that "[o]perating outside of the channel can be done safely but you must closely monitor depth and your proximity to shoal water." Captain Melton Deposition [DE-68-4] at 15; Exhibits in Support of Mt. for Summ. Jud. [DE-74-3] at 1.

Charles Paul testified that Captains Melton, Frazier, McKernan and Williams departed from the federally-marked navigation channel more often than others. Charles Paul Deposition [DE-68-7] at 52. Captain Melton testified that it was his standard practice to operate outside Buoys Red 16 and Red 18. Captain Melton Deposition [DE-68-4] at 18. Plaintiffs' management knew about Captain Melton's standard practice because they rode the boat to and from work. *Id.*

24

According to Captain Melton, anyone riding the boat would have noticed, and no one ever voiced disapproval of the practice. *Id.* at 18-19. McKernan admitted he knew that Captain Melton frequently operated outside the buoys. Claude McKernan Deposition [DE-68-3] at 40. At times, McKernan even asked Captain Melton, "Well, why aren't you cutting that buoy?" Captain Melton Deposition [DE-68-4] at 49. Captain Melton explained that by cutting Buoys 16 and 18, he could save between one and five minutes, which at times could "make or break" him keeping the schedule. *Id.* at 21. Many of Plaintiffs' captains not involved in the grounding expressed their professional opinions that operating the ferries outside of the buoys to make up time and save fuel was not a good practice and increased the risk of grounding. Joe Miller Deposition [DE-71-24] at 17-18; James Williams Deposition [DE-78-8] at 3-4; Steve Wilson Deposition [DE-78-10] at 2-4.

### c. Plaintiffs failed to provide a dedicated lookout for the Vessel when they knew she would be operated outside the marked channel, in close proximity to known shoals, and at a high rate of speed with the grounding alarm off.

The importance of a lookout was addressed by the Supreme Court in *The Adriane*, 80 U.S. 475 (1871):

> The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend. A moment's negligence on his part may involve the loss of his vessel with all the property and the lives of all on board. . . . In the performance of this duty the law requires indefatigable care and sleepless vigilance. The rigor of the requirement rises according to the power and speed of the vessel in question. . . . If this were not so, there would be no safety for other vessels. But it is equally important to vessels of that powerful class for their protection from one another. It is the duty of all courts, charged with the administration of this branch of our jurisprudence, to give it the fullest effect whenever the circumstances are such so to call for its application. Every doubt as to the performance of the duty, and the effect of non-performance, should be resolved against the vessel sought to be inculpated until she vindicates herself by testimony conclusive to the contrary.

25

80 U.S. at 478-79.

There were not enough deckhands on board the Vessel at the time of the grounding so that one deck hand could serve as a dedicated lookout to assist in navigation. Captain Melton Deposition [DE-68-4] at 11. Melton testified that it was "possible" that if a deckhand had been in the wheelhouse at the time of the grounding, or shortly before the grounding serving as a dedicated lookout, it could have assisted him in preventing the grounding. *Id.* Mark Mandrak, a ferry mate aboard the Vessel on the day of the grounding, testified that he was downstairs at the base of the stairs at the time of the grounding and noticed that the Vessel was too far over. Mark Mandrak Deposition [DE-71-26] at 10. Mandrak further testified that if he had been in the wheelhouse serving as a lookout, he could have alerted Captain Melton that they were too far over. *Id.*

The claimants concede that Plaintiffs' number of crew met the regulatory minimum. Mem. in Supp. of Mt. For Summ. Jud. [DE-73] at 24. Despite the fact that the crew might have met the regulatory minimum, it was negligence to have no one assigned to serve as a lookout in light of Plaintiffs' direction to operate on the far eastern side of the river, at a high rate of speed, outside of the marked channel, with the grounding alarm off, and in waters that had not been surveyed in at least nine years. Plaintiffs cannot disprove that their failure to have a dedicated lookout available to Captain Melton under these circumstances may have contributed to the grounding.

### d. Plaintiffs failed to ensure that Captain Melton was competent in radar usage.

26

Plaintiffs had a written policy requiring their masters to have a valid Radar Observer Endorsement. Claude McKernan Deposition [DE-68-3] at 49; Exhibit 50 [DE-71-22] at 3. According to McKernan, the radar was one of the tools used to keep your position on the river. Claude McKernan Deposition [DE-68-3] at 49. McKernan admitted that the use of radar could have aided in preventing the December 17, 2013 grounding. *Id.* McKernan knew that Captain Melton lacked a Radar Observer Endorsement at the time of the December 17, 2013 grounding. *Id.* at 49, 57. McKernan explained that he personally observed Captain Melton, and he was satisfied that Captain Melton knew how to use the radar adequately. *Id.* at 49. McKernan relied on his own belief that Captain Melton knew how to use the radar. *Id.* McKernan's subjective belief that Captain Melton was competent on the radar is not objective evidence that renders McKernan's belief objectively reasonable. *See In re Complaint of Messina*, 574 F.3d at 127 ("A vessel owner is not entitled to limited liability as a matter of law merely because he subjectively believed the person he has allowed to operate his craft was competent.")

### e. Plaintiffs were negligent and the Vessel unseaworthy because the Vessel was allowed to operate with its primary grounding avoidance equipment turned off, malfunctioning or out of date.

McKernan testified that a vessel's radar, plotter, and depth sounder are tools used to determine exact location. Claude McKernan Deposition [DE-68-3] at 33. Captain Melton testified that the Vessel's chart plotter data card, which contained the chart data of the depth of the water was out of date. Captain Melton Deposition [DE-68-4] at 19. Plaintiffs admit that the Vessel's fathometer or depth finder/sounder's alarm was turned off on the day of the grounding and was generally not used. Exhibit 76 [DE-75-14] at 10-11. Captain Melton testified that the alarm was not used because it gave false positive alarms, and it was a bad distraction because it

27

could be set at ten feet and would go off in fifty to sixty feet of water. Captain Melton Deposition [DE-68-4] at 20, 40.

### 3. Scearce's sworn claim establishes Plaintiffs' corporate knowledge.

Plaintiffs argue that Richard Scearce is not management from whom knowledge may be imputed for purposes of the Limitation of Liability Act. Mem. of Legal Authorities in Oppos. To Claimant Strickland's Mt. for Summ. Judg. [DE-68] at 18-20. Specifically, Plaintiffs contend that during Scearce's employment with BHIL, he never assumed the responsibility of providing any safety measures, assistance, of supervision with respect to any issues which may be related to the negligence giving rise to this suit. *Id.* at 19. Plaintiffs assert that the only application of Scearce's job to the ferry operation was limited to the application of general safety discussions as they pertained to "'the passengers or crew of the Vessel, such as slip and fall, such as cardiac arrest, such as heat stroke, and other safety issues that are not peculiar or unique to the marine environment.'" *Id.* at 19-20 (quoting Richard Scearce Affidavit [DE-87-25] ¶ 8).

When the shipowner is a corporation, "liability may not be limited under the statute where the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred." *Coryell v. Phipps*, 317 U.S. 406, 410 (1943). It is the extent of an employee's responsibilities, not his job title, that determines whether limitation of liability is appropriate. *In re Vulcan Materials Co.*, 369 F. Supp.2d 737, 741 (E.D.Va. 2005) (citing *Continental Oil v. Bonanza Corp.*, 706 F.2d 1365, 1377 n.16 (5th Cir. 1983)). When assessing whether an employee is a "managing agent," the court may look at the following non-exhaustive list of factors:

28

(1) the scope of the agent's authority over day-to-day activity in the relevant field of operations; (2) the relative significance of this field of operations to the business of the corporation; (3) the agent's ability to hire and fire other employees; (4) his power to negotiate and enter into contracts on behalf of the company; (5) his authority to set prices; (6) the agent's authority over the payment of expenses; (7) whether the agent's salary is fixed or contingent; and (8) the duration of his authority (i.e. full-time or restricted to a specific shift).

*Id.* (citing *In re Helenic Inc.*, 252 F.3d 391, 397 (5th Cir. 2001)). "[T]he dispositive question is whether the corporate employee is a 'managing agent' with respect to the field of operations in which the negligence occurred." *Cupit v. McClanahan Cont., Inc.* 1 F.3d 346, 348 (5th Cir. 1993).

Scearce holds the position of Safety Director and is a senior management level employee and the top level person with respect to safety issues for BHIL.[5] Gail English Deposition [DE-78-3] at 2-3. Plaintiffs rely on Scearce's March 17, 2015 Affidavit to support their assertion that Scearce lacks management responsibilities with respect to the ferries. Scearce's Affidavit in pertinent part provides as follows:

> 10. During my entire employment by Bald Head Island Limited, I have never been asked to, or assumed the responsibility of providing any safety measures or assistance with respect to the:
> a. employment, monitoring the performance, and terminating members of the crew of the ferries, particularly the Captain of any ferry;
> b. the selection of the vessels to act and be the ferries serving Bald Head Island;
> c. the navigation and handling of the ferries;
> d. whether the ferries are or are not, and were or were not, adequately manned and fully serviceable for their intended uses; and
> e. determining the speed at which, or the route by which, each ferry navigated the reach between Deep Point and Bald Head Island.

---

[5]In addition to being the corporate officer in charge of safety, Scearce was also a passenger on the Vessel at the time of the December 17, 2013 grounding.

29

In short, I had nothing to do with the conduct of the operation of the
Transportation Division, except the general safety instructions applicable to all
divisions and all employees of Bald Head Island Limited[.]

[DE-87-25] at 3.

The court concludes that Plaintiffs' claim that Scearce lacked supervisory authority based

on Scearce's March 17, 2015 Affidavit differs from their earlier responses and is little more than

a sham issue of fact. *See Rohrbough v. Wyeth Labs, Inc.*, 916 F.2d 970, 975 (4th Cir. 1990)

(holding that if an affidavit conflicts with earlier sworn testimony, it must "be disregarded as a

sham issue of fact").

In Plaintiffs' Answers to Claimants' Interrogatories, dated November 10, 2014, Plaintiffs

were asked whether there was a safety management system in effect that applied to the Vessel.

[DE-75-14] at 7-8. Plaintiffs responded that they had a safety management system in effect that

applied to the Vessel and noted that they had hired Richard Scearce as Safety Officer in 2005.

*Id.* at 8. Plaintiffs further responded as follows:

Mr. Scearce provided a number of safety training sessions for BHIL employees
including CPR, First aid, AED, blood borne pathogen training, accident reporting,
ride with the Driver, MSDA training, lock out tag out, ANSL Fire Suppression
Training and certification, Fire extinguisher training, training, and other sessions
which applied to the Vessel. . . .

*Id.*

Shirley Mayfield, CFO and Manager of BHIL, testified that Scearce's duties as Safety

Officer included investigating the causes of accidents covering *all* BHIL assets. Shirley Mayfield

Deposition [DE-68-24] at 14. Following his investigation, Scearce then made recommendations

to the company as to any changes in policy and procedure. *Id.* Scearce also worked with the

insurance companies who came in to do audits, which included looking at Plaintiffs' vessels. *Id.*

30

Charles A. Paul, President of BHIT, testified that Scearce is Safety Officer for the entire company. Charles Paul Deposition [DE-71-8] at 34. According to Paul, Scearce's position covered aspects of both marine and non-marine. *Id.*

In light of Plaintiffs' Answers to Claimants' Interrogatories and Mayfield's and Paul's deposition testimony, the court finds that Scearce had supervisory authority within Plaintiffs' organizations over marine safety management. Accordingly, Scearce's statements will be imputed to Plaintiffs for the purpose of privity or knowledge.

Plaintiffs further argue that even if Scearce qualified as management for purposes of the Limitation of Liability Act, the material portions of Scearce's Verified Claim relied upon by claimant Strickland must be disregarded because they are conclusions of law. Mem. of Legal Authorities in Oppos. To Claimant Strickland's Mt. for Summ. Judg. [DE-68] at 20.

At the outset, the court notes that Plaintiffs concede that claimant Strickland does not identify which particular allegations contained in Claimant Scearce's Verified Claim are relied upon. *Id.* The court concludes that Claimant Scearce's Verified Claim consists of both statements of fact and conclusions of law. The court notes that Scearce's knowledge base for the statements of fact come from being Safety Director and a senior management level employee and the top level person with respect to safety issues for BHIL and also from the fact that Scearce was a passenger onboard the Vessel on December 17, 2013, when it grounded.

Plaintiffs have failed to carry their burden of demonstrating the lack of privity or knowledge; thus, they are not entitled to limitation of liability. Consequently, Plaintiffs' petition for exoneration or limitation is DISMISSED with prejudice. Further, Claimant Tammy Strickland's Motion for Summary Judgment and Bonnie Cockrell, Mary Beth Springmeier, and

31

Steven Donecker's Motion for Summary Judgment are ALLOWED. This matter is REFERRED to U.S. Magistrate Judge Robert B. Jones, Jr. to conduct a status conference and enter a scheduling order governing Phase II of the litigation.[6]

## D. Plaintiffs' Motion for Partial Summary Judgment on Claimants' Punitive Damages Claims and Plaintiffs' Motion to Dismiss Claimant Bonnie Cockrell's Claim for Punitive Damages

Plaintiffs move for partial summary judgment on claims by the claimants Steven A. Donecker, Mary Beth Springmeier, Tammy Strickland, and Bonnie Cockrell[7] for punitive damages, arguing that these claimants have failed to marshal sufficient evidence or a forecast of evidence to support their allegations that Plaintiffs' conduct was sufficiently egregious to award punitive damages. Mem. in Supp. of Pls' Mt. for Part. Summ. Judg. [DE-71-1] at 9-17. Specifically, Plaintiffs argue as follows: The allowance of the ferry captains to use their sound judgment in navigating the ferries, including outside the federally-marked shipping channel, is insufficient to serve as a basis for punitive liability; The ferry operation pursuant to a state-approved ferry schedule is insufficient to serve as the basis for punitive liability; The previous ferry groundings are unrelated to the December 17, 2013 grounding and are insufficient to serve as the basis for punitive liability; and Senior management never encouraged or instructed their captains to disable depth detection equipment. *Id.* Plaintiffs further argue that punitive damages

---

[6]As noted, the August 21, 2014 Scheduling Order notes that this action will be bifurcated into two phases. [DE-51] at 1. The primary focus of Phase I will be issues related to exoneration and limitation of liability, and the focus of Phase II will be any remaining claimant's respective damages. *Id.*

[7]Plaintiffs note that their Motion for Partial Summary Judgment as to Claimant Cockrell's claim for punitive damages is cumulative to and does not supplant their Motion to Dismiss Claimant Cockrell's claim for punitive damages on the basis that she is barred as a matter of law from seeking non-pecuniary damages against Plaintiffs. [DE-71-1] at 8 n.1.

32

are manifestly improper in this case because there is no genuine issue of material fact that they operate a safe public transportation entity that cares deeply about the safety of the passengers and crew. *Id.* at 17-19.

Plaintiffs have moved to dismiss Claimant Bonnie Cockrell's claim for punitive damages, arguing that punitive damages are not recoverable under negligence claims brought pursuant to the Jones Act, 46 U.S.C. § 30101, *et seq.*; punitive damages are not recoverable under claims of unseaworthiness brought by Jones Act seamen; and Claimant Cockrell does not make a claim for punitive damages for Plaintiffs' willful failure to pay maintenance and cure. Mem. in Supp. of Pls' Mt. to Dismiss [DE-70] at 3-8.

In the court's equitable discretion the court has chosen not to address the issue of punitive damages. Accordingly, Plaintiffs' Motion for Partial Summary Judgment on Claimants' Punitive Damages Claims and Plaintiffs' Motion to Dismiss Claimant Bonnie Cockrell's Claim for Punitive Damages are DISMISSED without prejudice to Plaintiffs to renew these claims in the forum of their choice.

## IV. CONCLUSION

For the foregoing reasons, the court orders as follows:

(1) Claimants Tammy Strickland, Bonnie Cockrell, Steven Donecker and Mary Beth Springmeier's Motion to Strike [DE-82] is ALLOWED;

(2) Claimant Tammy Strickland's Motion for Summary Judgment [DE-65] is ALLOWED;

(3) Plaintiffs' Motion to Dismiss Claimant Bonnie Cockrell's Claim for Punitive Damages [DE-69] is DISMISSED without prejudice;

33

(4) Plaintiffs' Motion for Partial Summary Judgment on Claimants' Punitive Damages

Claims [DE-71] is DISMISSED without prejudice; and

(5) Claimants Bonnie Cockrell, Mary Beth Springmeier, and Steven Donecker's Motion

for Summary Judgment [DE-72] is ALLOWED.

SO ORDERED.

This, the __18__ day of August, 2015.

JAMES C. FOX
Senior United States District Judge